IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

WINSTON CAMPBELL,
    Plaintiff,

v.                                Case No.: 3:11cv326/RV/EMT

MICHAEL J. ASTRUE,
Commissioner of the Social Security
Administration,
    Defendant.
_____/

## REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq*. It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's "current (or third) application" for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, filed by Plaintiff on February 27, 2007. Upon review of the record before this court, it is the opinion of the undersigned that the decision of the Commissioner should be affirmed.

I.    PROCEDURAL HISTORY

      Plaintiff filed two Title II applications prior to the current application. He filed the first one on April 9, 1997, and alleged therein disability as of January 6, 1986, due to a workplace back injury (Tr. 16, 35).[1] After this application was denied initially and upon review, Plaintiff requested a hearing before an administrative law judge ("ALJ") (Tr. 35). On October 14, 1999, following a

---

[1] All references to "Tr." refer to the transcript of Social Security Administration record filed on October 5, 2011 (Doc. 8). Moreover, the page numbers refer to those found on the upper right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system.

hearing, the ALJ issued a decision in which he found that Plaintiff was last insured for DIB purposes on March 31, 1992 (thus, as this court is well aware, Plaintiff would have to prove that his disability began before this date last insured ("DLI")) (Tr. 35, 38). The ALJ further found that Plaintiff was not disabled because he was able to perform a significant number of jobs existing in the national economy prior to his DLI, despite his physical injuries and associated limitations (*see* Tr. 39, 43). Plaintiff, who was not represented by counsel in connection with the first application, did not seek further review of the ALJ's decision (*see* Tr. 16).

Plaintiff filed a second Title II application on February 11, 2004, more than four years after the ALJ issued an unfavorable decision as to the first application, and he alleged therein the same disability onset date as before, that is, January 1, 1986 (Tr. 16, 65–67). The second application was denied at the initial level of determination on February 28, 2004, on the basis of res judicata, and not pursued further by Plaintiff (*see* Tr. 16).[2]

Three years later, on February 27, 2007, Plaintiff filed the current application for DIB and alleged therein a disability onset date of February 1, 1986, which is one month later than the onset date alleged in his previous applications (*id.*). The third application was denied initially on the same ground as Plaintiff's second application (that is, res judicata) (*see* Tr. 53),[3] and on April 9, 2007—through counsel—Plaintiff filed a request for reconsideration (Tr. 56). Plaintiff's claim was denied at the reconsideration level of determination, on the same ground as before, and Plaintiff's counsel filed a written request for a hearing before an ALJ (Tr. 16–17, 57; *see also* Tr. 58–59). A limited hearing was held on January 8, 2009 (*see* Tr. 735–41), during which the ALJ advised Plaintiff's counsel that she could submit additional evidence and a memorandum outlining the reasons she believed Plaintiff's claim for DIB was not barred by res judicata (*see id.*; *see also* Tr. 19). On February 4, 2009, counsel submitted a letter/memorandum to the ALJ and asserted therein:

---

[2] It appears that Plaintiff also proceeded *pro se* in connection with his second application, as the notice advising Plaintiff that this claim had been disapproved was mailed directly to Plaintiff, not an attorney (*see* Tr. 48), and neither Plaintiff nor the Commissioner contend here that Plaintiff was represented by counsel (*see* Doc. 10 at 3; Doc. 13 at 2).

[3] Plaintiff was unrepresented by counsel at the time he filed the current application and at the time of its initial denial (*see, e.g.*, Tr. 53; Doc. 10 at 3).

(1) that "new evidence" regarding Plaintiff's condition foreclosed the application of res judicata[4]; and (2) that good cause existed for Plaintiff's failure to previously appeal the denial of his claim (or otherwise exhaust his administrative remedies) because "he lacked the mental ability to understand the procedures for requesting review" (*see* Tr. 131).  On March 13, 2009, the ALJ issued a decision in which he found that Plaintiff's third application was barred by res judicata because the decision denying Plaintiff's first application, dated October 14, 1999, involved the same facts and issues as Plaintiff's current application (Tr. 16–22, 32–45).  On May 17, 2011, the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 6–8).

In the instant appeal, Plaintiff essentially claims that the ALJ erred in denying his third application based on res judicata, although he also raises various, related sub-claims (*see* Doc. 10). The Commissioner contends the ALJ evaluated Plaintiff's claim(s) for DIB in accordance with applicable statutes and regulations, and further, that the Commissioner's decision is supported by substantial evidence on the record as a whole and should be affirmed (*see* Doc. 13).

III.   DISCUSSION

    A.   Subject Matter Jurisdiction

The extent of this court's subject matter jurisdiction in this case is governed by 42 U.S.C. § 405(g), which provides a limited grant of authority to federal district courts to review decisions of the Commissioner.  Specifically, a disappointed Social Security disability benefits claimant may only obtain judicial review of the Commissioner's decision once the decision has become "final." *See* Califano v. Sanders, 430 U.S. 99, 108 (1977).  Congress did not define the contours of what constitutes a "final decision" under the Act.  Instead, Congress expressly left it to the discretion of the Social Security Administration to flesh out its meaning through the promulgation of regulations. Weinberger v. Salfi, 422 U.S. 749, 766 (1975).

Here, the relevant regulations provide that, in the absence of a showing of good cause, where an individual's prior application for benefits has been denied, and—where, as here—the individual failed to exhaust available administrative remedies as to that denial, the unfavorable decision

---

[4] Counsel described the "new evidence" as Plaintiff's "new testimony," a report regarding an evaluation performed by Lawrence Gilgun, Ph.D., "the physical limitations on the FERS (Florida Employee Retirement System) forms, and numerous other medical records dating back before the expiration of [Plaintiff's] insured status" (Tr. 131).

becomes final and binding. 20 C.F.R. §§ 404.987–.989. *See also* Sims v. Apfel, 530 U.S. 103, 104–05 (2000) ("A person whose claim for Social Security benefits is denied by an . . . []ALJ[] must in most cases before seeking judicial review of that denial, request that the Social Security Appeals Council review his claim). The regulations further provide, though, that "a determination or a decision . . . which is otherwise final and binding may be reopened and revised by [the Commissioner]" subject to certain time limitations.[5] However, "once a decision becomes administratively final, the [Commissioner's] decision to reopen a claim is purely discretionary" and, therefore, his refusal to reopen a claim is not a "'final' decision subject to judicial review." Taylor v. Heckler, 765 F.2d 872, 877 (9th Cir. 1985); *see also* Cherry v. Heckler, 760 F.2d 1186, 1189 (11th Cir. 1985) (refusing to review ALJ's decision not to reopen a previous application in the absence of a constitutional question); Krumpelman v. Heckler, 767 F.2d 586, 588 (9th Cir. 1985) ("District courts . . . have no jurisdiction to review a refusal to re-open a claim for disability benefits or a determination that such a claim is res judicata.").

As noted *supra*, Plaintiff is only eligible to receive benefits under Title II if he was "disabled" prior to March 31, 1992, his DLI. The determination that Plaintiff was "not disabled" prior to his DLI became "final" when Plaintiff failed to seek review by the Appeals Council of the ALJ's decision dated October 14, 1999, denying his first claim for DIB. *See* Sims, 530 U.S. at 104–05; *see also* 20 C.F.R. § 404.900(a) (explaining the administrative review process). Additionally, there is no evidence that Plaintiff attempted to reopen the October 1999 decision within the four-year window, as required by 20 C.F.R. § 404.988(b), since he did not file his second application for DIB until February 2004.[6] Therefore, his second and third applications for DIB appear to be time-barred, in addition to being barred based by res judicata. However, because the Commissioner denied the claims based on res judicata, this court's review must focus on that

---

[5] With limited exceptions, even where good cause can be shown, the regulations only permit a prior decision or determination to be reopened "within four years of the date of the notice of the initial determination." 20 C.F.R. § 404.988(b). There are certain exceptions to this time limitation, but such exceptions do not apply here. *See id.* § 404.988(c).

[6] As previously noted, Plaintiff alleged the same disability onset date in the second application and, of course, his date last insured has never changed. Thus, the second application is in all relevant respects identical to the first.

determination. As previously noted, however, this court has no jurisdiction to review a determination of res judicata because such a determination is not a "final" decision. Accordingly, this court is without subject matter to review the Commissioner's determination that Plaintiff's current application for DIB is barred by the doctrine of res judicata.

      B.      Whether the Finding of Res Judicata May Otherwise be Reviewed

Apparently recognizing that this court does not have subject matter jurisdiction to review the Commissioner's res judicata determination, Plaintiff instead correctly argues that an administrative finding of res judicata is reviewable if a claimant raises a colorable constitutional claim. This is so because administrative proceedings are unsuitable for the resolution of constitutional issues, and thus "when constitutional questions are in issue, the availability of judicial review is presumed." Califano, 430 U.S. at 109. Thus, although this court has no subject matter jurisdiction to entertain Plaintiff's complaint to the extent he claims he is disabled and eligible for DIB, this court does have jurisdiction to entertain Plaintiff's complaint to the extent he has raised a colorable constitutional claim related to the earlier denial of benefits. *See id.* (no subject matter jurisdiction where "Respondent [sought] only an additional opportunity to establish that he satisfies the Social Security Act's eligibility standards for disability benefits," and his case was "not one of those rare instances where the [Commissioner's] denial of a petition to reopen is challenged on constitutional grounds"). In the Eleventh Circuit, a plaintiff raises a colorable constitutional claim where he has shown that: "(1) he suffers from a medically-documented mental illness which serves as the basis for his disability claim; (2) on his first application he was without the assistance of counsel or other suitable representation; and (3) he cannot assert a new claim for benefits because he now lacks insured status." Elchediak v. Heckler, 750 F.2d 892, 895 (11th Cir. 1985). If Plaintiff satisfies each of the three Elchediak prongs, this court may remand his case to the Commissioner with instructions to determine whether Plaintiff's mental illness prevented him from understanding and pursuing his administrative remedies following the denial of his first application for benefits. *See id.*, 750 F.2d at 894.

Here, relying upon Elchediak, Plaintiff contends he has raised a colorable constitutional claim because he has a documented mental impairment that precluded him from navigating through

the various levels of administrative review and from understanding the administrative remedies available to him following the denial of his first claim for DIB in October 1999[7] (*see* Doc. 10 at 6). In support of his contention, Plaintiff points to the following evidence in the record (*see* Doc. 10 at 6–7):

1. In an intake evaluation report from the Work Performance Rehabilitation Center ("WPRC"), which appears to have been made in early October 1986, a therapist noted as follows: (a) Plaintiff "tends not to take responsibility or provide initiative. . . ."; (b) Plaintiff is "unaware of those things that will return him to activity"; and (c) Plaintiff's "[p]rognosis has to be guarded at this time because of his attitude towards his injury of being helplessly dependent" (Tr. 142–43, 145; *see also* Tr. 146).

2. In a WPRC discharge summary, dated November 19, 1986, a therapist noted that a "secondary disincentive is emotional in that [Plaintiff] is rather limited in education and has no marketable skills save for his labor abilities in the past" (Tr. 144).

3. On March 28, 1988, E.F. Eyster, M.D., a neurologist who was treating Plaintiff for back pain related to his work injury, described him as "dirty" (Tr. 418).

4. On August 16, 1988, Dr. Eyster described Plaintiff as an "ill-kept [sic] overweight middle-aged male who appears older than his stated age of 40" (Tr. 416).

5. Dr. Gilgun, who evaluated Plaintiff's intelligence on January 16, 1990, stated he had no "doubt that [Plaintiff] has very severe academic problems" and suggested that Plaintiff work in a job that would accommodate his orthopedic difficulties as well as his intellectual problems and illiteracy (Tr. 160–61).

This evidence, Plaintiff asserts, documents a mental impairment "consisting largely of [Plaintiff's] illiteracy and lack of education, but also evidenced through the interactions with his medical providers" (Doc. 10 at 6). Plaintiff's assertion, however, is unpersuasive.

First, "illiteracy and lack of education" do not establish a mental disorder; they are vocational factors. *See* 20 C.F.R § 404.1564 (education is a vocational factor and is considered in determining a claimant's ability to meet vocational requirements, including reasoning, mathematics, and communication); *see also* Wolfe v. Chater, 86 F.3d 1072, 1077–78 (11th Cir. 1996) (while mental retardation may be considered a non-exertional impairment that may significantly limit a claimant's basic work skills or otherwise prevent the claimant from performing a full range of

---

[7] The parties do not dispute that Plaintiff satisfies the second and third prongs of the Elchediak test (*see, e.g.*, Doc. 13 at 5). The issue thus becomes whether Plaintiff has satisfied the first prong.

employment a particular level of exertion, illiteracy is not such a non-exertional impairment). Moreover, the ALJ's 1999 decision specifically addresses Plaintiff's seventh grade education and illiteracy in assessing Plaintiff's ability to perform other available work (Tr. 38, 43–44).[8]

Second, having carefully reviewed those portions of the record identified by Plaintiff (*supra*, at numbers 1–5),[9] the undersigned concludes that Plaintiff has not even come close to establishing the first prong of Elchediak. While this conclusion may not need elucidation, the undersigned nevertheless makes the following observations regarding each portion of the record identified by Plaintiff:

1.  The WPRC intake report makes it clear that Plaintiff was referred for physical rehabilitation as a result of his work injury, and it makes no mention of any mental impairment, cognitive disorder, or need to address mental health issues (*see* Tr. 142–43, 145). Additionally, despite assessing a guarded prognosis, the therapist stated that a "four to six week period [of rehabilitation] should be sufficient" (Tr. 145). The therapist also noted that "[t]he physical therapy aspects [of the work performance and rehabilitation program] would provide increased flexibility, strength of endurance and general conditioning [and] would be of great benefit to [Plaintiff] in his attempts to return to work" (*see* Tr. 142, 145). The therapist opined it was unlikely that Plaintiff could return to his former work because his former work was performed at a heavy exertional level, not because Plaintiff was mentally incapable of performing it (Tr. 145).

2.  Although the WPRC discharge summary does describe a "secondary disincentive" regarding Plaintiff's return to work, as Plaintiff points out, the summary also describes his primary disincentive as financial (that is, the report notes that Plaintiff engaged in symptom magnification and made his physical condition seem worse then it actually was because he believed by doing so he might collect a more substantial financial settlement) (Tr. 141, 144). As with the intake report, the discharge summary contains no indication that Plaintiff was unable to work due to any mental limitations and, indeed, it includes a recommendation that Plaintiff "be released to return to work within his stated physical capacity" (Tr. 144).

---

[8] Although the ALJ described Plaintiff as having a seventh grade education (Tr. 38), Plaintiff reported he completed the eighth grade in regular classes (*see* Tr. 103).

[9] The court's October 11, 2011, Scheduling Order, in relevant part directed Plaintiff to "specifically cite the record by page number for factual contentions," and it further instructed that "[f]ailure . . . to support factual contentions with accurate, precise citations to the record will result in the contention(s) being disregarded for lack of proper development." (Doc. 9 at 1–2, emphasis in original). Thus, the pages cited by the Plaintiff are those on which the court has primarily focused its review.

Case No.: 3:11cv326/RV/EMT

3.,4.  Although Dr. Eyster described Plaintiff as dirty and ill-kempt, Plaintiff has not referenced any report from Dr. Eyster suggesting that he had a mental impairment or mental limitations, diagnosing any such impairment, or indicating that Plaintiff was in need of mental health treatment. Moreover, the treatment records reflect that Dr. Eyster treated Plaintiff for a physical condition (i.e., back pain related to his work injury).

5.  On January 16, 1990, Plaintiff was evaluated by Lawrence J. Gilgun, Ph.D., in connection with his vocational rehabilitation program (*see* Tr. 160–61). Dr. Gilgun administered intelligence quotient ("IQ") tests, the results of which suggest Plaintiff functioned in the "borderline mentally defective range" (Tr. 160, reflecting IQ scores of 74 (verbal), 81 (performance), and 77 (full scale)). None of these scores satisfy the criteria of the listing for mental retardation. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05C (requiring a valid IQ score below 71). Moreover, although Plaintiff claimed to have profound limitations in reading and mathematics, and he told Dr. Gilgun he could not spell even simple words like "cat," Dr. Gilgun did not believe Plaintiff was as limited as he claimed, and he did not think Plaintiff's IQ scores were accurate reflections of his abilities (Tr. 161). Dr. Gilgun wrote, "To be quite frank, I don't necessarily believe" Plaintiff's IQ scores (*id.*). Dr. Gilgun noted that Plaintiff had been "very disgruntled and just refused to cooperate" toward the end of testing, and further, that Plaintiff had obviously exaggerated his academic problems (Tr. 20, 161). As an example, Dr. Gilgun pointed out that Plaintiff claimed he could not add 7 and 2, but in a later portion of testing Plaintiff was able to adequately perform simple addition and subtraction (Tr. 161).[10]

The foregoing discussion demonstrates that the facts in the instant case are substantially distinguishable from those in Elchediak, wherein the claimant alleged disability due to paranoid schizophrenia ("PS"), all the available medical evidence confirmed that he suffered from PS, and his PS was severe enough to require hospitalization on several occasions, including an eighteen-day hospitalization just two months prior to his receiving notice that his initial application had been denied. 750 F.2d at 893–94. On those facts, the Eleventh Circuit concluded that Mr. Elchediak's case required remand to the Commissioner to determine whether his PS prevented him from understanding and pursuing his administrative remedies following the denial of his first application for benefits. *Id.* at 894. Here, the record reflects that Plaintiff discontinued working—and claimed

---

[10] Plaintiff acknowledges that "Dr. Gilgun expressed the opinion that [Plaintiff] may not be as limited as he stated," but he claims the doctor nevertheless "confirmed" the presence of a "mental impairment" (*see* Doc. 10 at 7). The court cannot agree that he confirmed the presence of a mental impairment. Dr. Gilgun did not diagnose any mental disorder; he noted only a poor academic performance and exaggeration by Plaintiff (Tr. 160–61).

disability—due to an on-the-job back injury and resulting pain and physical limitations (*see, e.g.*, Tr. 38–39).  Additionally, the evidence Plaintiff has pointed to is woefully insufficient to establish the first Elchediak prong.  Accordingly, remand is not required in this case.  *See* Elchediak, 750 F.2d at 894 ("we do not intimate that every claimant who alleges that a mental problem or disorder prevented them from understanding and pursuing administrative remedies will have raised a constitutional issue"); *see also* Stewart v. Astrue, No. 5:08cv90-Oc-10GRJ, 2008 WL 3982690, at *3 (M.D. Fla. Aug. 26, 2008) (remand not warranted where, among other factors, "the record suggests that it was the injuries Plaintiff incurred during a job-related accident—and not any aspect of Plaintiff's mental health—that served as the primary basis for Plaintiff's . . . application for disability benefits," and "there [wa]s no evidence that the issue of Plaintiff's mental health was even brought to the attention of the Commissioner at the time of his prior application")).  *Cf.* Woods v. Apfel, No. Civ.A. 99-0640-P-S, 2000 WL 1367986, at *1–*4 (S.D. Ala. Aug. 18, 2000) (first prong of Elchediak satisfied where ALJ found that claimant had the severe impairment of a mentally deficient range of intelligence (based in part on IQ scores of 64, 66, and 67) and found that Plaintiff was entitled to supplemental security income based on his severe impairments, including his mental impairment).

      The burden is on Plaintiff to affirmatively demonstrate a sufficient basis for a constitutional claim, and a mere allegation that his constitutional rights have been violated is not enough.  Colon v. Sec'y of Health & Human Serv., 587 F. Supp. 502, 503 (D.P.R. 1984) (conclusory allegations that constitutional rights were violated insufficient to confer subject matter jurisdiction); Lumsden v. Califano, 479 F. Supp. 839 (D. Ariz. 1979) (plaintiff's claim must be something more than a request for an additional opportunity to establish that he or she is disabled); *see also* Jones v. Dep't of Health & Human Serv., 941 F.2d 1529, 1533 (11th Cir. 1991) (holding that plaintiff's failure to provide supporting evidence of constitutional evidence was fatal to constitutional claim).  Plaintiff has clearly failed to meet his burden here, and because no constitutional claim has been established the court has no subject matter over Plaintiff's complaint.

      C.      Plaintiff's Remaining Contentions

Plaintiff appears to contend the ALJ erred in failing to conduct a full administrative hearing in connection with Plaintiff's third application for DIB, and by determining that the "new evidence" Plaintiff submitted in connection with the third application was "not new and material to the determination of disability," without stating which exhibits were considered at the time of the October 1999 denial, without having access to Plaintiff's testimony during the first administrative hearing, and without permitting Plaintiff to testify at the limited hearing held in January 2009 (Doc. 10 at 3–4). Plaintiff also contends that portions of the 1999 decision are undecipherable, "thus prohibiting comparison of the previous application to the current application for a full and fair determination of whether new and material evidence has been submitted" (*id.* at 4).[11] Finally, Plaintiff contends the ALJ was biased, as evidenced by the "prejudicial treatment of [Plaintiff's] request to reopen," because he is the same ALJ that issued the unfavorable 1999 decision (*id.*). None of these contentions entitle Plaintiff to relief.

As previously discussed, this court has no subject matter jurisdiction to review the Commissioner's res judicata determination unless Plaintiff raises a colorable constitutional claim. The majority of Plaintiff's contentions clearly raise no such colorable claim and need not be further discussed. Although three of Plaintiff's contentions—those relating to the submission of "new evidence," the ALJ's alleged failure to permit Plaintiff to testify, and the ALJ's alleged bias—also do not appear to raise a colorable claim, they are briefly discussed here to demonstrate that they form no basis for relief. The ALJ carefully considered the "new evidence" submitted by Plaintiff and concluded that the evidence generally relates to a time frame beyond Plaintiff's DLI (with the exception of Dr. Gilgun's report, which—as previously discussed—in no way undermines the ALJ's 1999 decision or establishes a mental impairment) (*see* Tr. 20–21).[12] Moreover, in considering the

---

[11] As discussed next, this particular claim raises no colorable constitutional claim and thus warrants no further analysis, but it should be noted that nine pages of the of the eleven-paged 1999 decision, which include the entire narrative portion of the decision, are clearly legible; the "findings" section, although mis-formatted, is largely decipherable (*see* Tr. 35–45).

[12] It appears to the undersigned that by presenting this new evidence, Plaintiff's counsel essentially sought to reopen his case. The time for doing so, however, had passed long before counsel began representing Plaintiff. *See* 20 C.F.R. §§ 404.988(b), 404.989(a)(1) (providing, in relevant part, for a four-year period during which re-opening may be allowed if new and material evidence is presented). Here, the new evidence is both untimely and immaterial.

new evidence the ALJ did not reopen or reconsider the merits of Plaintiff's previously denied application, as Plaintiff concedes (Doc. 10 at 3). *See, e.g.*, Brown v. Sullivan, 921 F.2d 1233, 1237 (11th Cir. 1991) (stating that, in determining whether res judicata applies, "if the [Commissioner] merely considers newly proffered evidence without reconsidering the merits of the previously denied application, then he has not reopened that application"); Cherry, 760 F.2d at 1189 (11th Cir. 1985) (noting that the Commissioner "must in fairness look far enough into the proffered factual and legal support [for the first application] to determine whether it is the same claim, and if so, whether it should nevertheless be reopened as a discretionary matter" (quotation marks omitted)). Thus, the 1999 decision was never reopened and remains the "final" decision of the Commissioner.

Additionally, the transcript of the January 2009 hearing reflects that Plaintiff was represented by counsel, his counsel did not indicate to the ALJ that Plaintiff wished to testify, and the ALJ advised counsel she could submit materials to him following the limited hearing (*see* Tr. 735–41). Thus, to the extent the ALJ's actions at the hearing can be construed as "failing to permit Plaintiff to testify," there is no reason why Plaintiff could not have submitted an affidavit or similar statement after the hearing, in which his purported testimony was summarized.

Finally, Plaintiff's allegation that the ALJ was biased against him warrants no relief. First, the allegation is wholly conclusory. *See, e.g.*, Liteky v. United States, 510 U.S. 540, 551 (1994) (Plaintiff must show that the ALJ's behavior, in the context of the whole case, was "so extreme as to display clear inability to render fair judgment."); *see also* Withrow v. Larkin, 421 U.S. 35, 47 (1975) (a claim of bias/dishonesty against an ALJ must overcome the "presumption of honesty and integrity in those serving as adjudicators"). Plaintiff has pointed to nothing in the record that demonstrates extreme behavior an any other action by the ALJ to overcome the presumption of honesty. Second, Plaintiff was required to notify the ALJ at his earliest opportunity if he believed the ALJ was biased, *see* 20 C.F.R § 404.940, which Plaintiff failed to do since he raised the issue of bias for the first time in this court.

IV.  CONCLUSION

This court is without subject matter jurisdiction to review the administrative finding of res judicata because Plaintiff has failed to establish a colorable constitutional claim under Elchediak, 750 F.2d at 892. More specifically, Plaintiff has failed to meet his burden of demonstrating that he

suffered from a mental illness which interfered with his ability to protect his rights under the Social Security Act. Additionally, Plaintiff has failed to establish any other basis that warrants relief in this action.

Accordingly, it is respectfully **RECOMMENDED**:

1. That this action be **DISMISSED** based on a lack of jurisdiction.
2. That the clerk be directed to close this file.

At Pensacola, Florida this 11th day of June 2012.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof. **Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.** A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* **28 U.S.C. § 636;** United States v. Roberts**, 858 F.2d 698, 701 (11th Cir. 1988).**